IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FRANKIE L. McCOY, SR.,  *

Plaintiff  *

v.  *  Civil Action No. WDQ-10-1481

CORRECTIONAL MEDICAL SERVICES, et al.  *

Defendants  *

\*\*\*

MEMORANDUM

Pending in this civil rights case are the Defendants' Motions to Dismiss or for Summary Judgment.[1] ECF Nos. 21 & 35. The Plaintiff opposes the motions. ECF Nos. 29, 38-40, 45, 49, 52, 54-56.[2] Also pending is Defendant Wexford's response to the Plaintiff's reply. ECF Nos. 30, 51 & 53.[3] No hearing in this matter is necessary. *See* Local Rule 105.6 (D. Md. 2011).

Background

The Plaintiff is a Maryland State inmate who suffers from cervical spondylosis, lumbar degenerative disc disease, bunions on his right foot, corns on his left foot, "drop foot", and temporomandibular joint disease ("TMJ"). The Plaintiff also uses an arm brace for left forearm pain. ECF Nos. 1, 21 & 35. The Plaintiff alleges he has been denied follow-up care ordered by physicians. He alleges that he has been denied an MRI for his right knee injury; follow- up with

---

[1] Defendant Tom Linguise has not been served with the Complaint. For the reasons that follow, had the Complaint been properly served he would be entitled to summary judgment. Accordingly, the claims against him will be dismissed.

[2] Plaintiff's requests for an independent medical exam and to subpoena witnesses, contained in his supplemental opposition (ECF No. 55) will be denied.

[3] Plaintiff has filed a Motion for Appointment of Counsel. ECF No. 50. A federal district court judge's power to appoint counsel under 28 U.S.C. § 1915(e)(1)[3] is a discretionary one, and may be considered where an indigent claimant presents exceptional circumstances. *See Cook v. Bounds*, 518 F.2d 779, 779 (4th Cir. 1975); *see also Branch v. Cole*, 686 F.2d 264, 266 (5th Cir. 1982). The question of whether such circumstances exist in a particular case hinges on the characteristics of the claim and the litigant. *See Whisenant v. Yuam*, 739 F.2d 160, 163 (4th Cir. 1984). The Court finds that Plaintiff is able to adequately articulate the facts and grounds for relief in the instant matter without difficulty and the complaint is not unduly complex. The Motion shall be denied.

a podiatrist for surgery on his right foot bunion, repair of his arm brace, and referral to a dental specialist for TMJ. He alleges that the referrals were pending when he was transferred for retaliatory reasons to the Western Correctional Institution. He also alleges that Christy Whitehair confiscated his medically prescribed adjustable cane, and that being forced to travel in a bus without toilet facilities from the Western Maryland area to the Baltimore Metropolitan area for court appearances has caused him to soil himself. ECF No. 1.

Standard of Review

Fed. R. Civ. P. 56(a) provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to....the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually

unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

Analysis

It is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir.2004) (no respondeat superior liability under § 1983); *see also Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir.2001) (no respondeat superior liability in a *Bivens* suit). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.' " *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir.2001), *citing Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir.1984).

Supervisory liability under § 1983 requires evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to, or tacit authorization of, the offensive practices; and (3) there was a causal link between the supervisor's inaction and the constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir.1994).

The Plaintiff has identified no action or inaction on the part of Defendants Wexford & Associates and Correctional Medical Services, Inc. that resulted in a constitutional injury. Wexford's Motion for Summary Judgment makes clear its provision of medical care is limited to

review of requested services received from medical care personnel. To the extent any requested service for the Plaintiff was denied by Wexford, the denial was based on objective medical criteria which did not indicate a need for the requested test. The Plaintiff does not have a constitutional right to unlimited medical testing or care.

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) *citing Wilson v. Seiter*, 501 U.S.294, 297 (1991). To state an Eighth Amendment claim for denial of medical care, the Plaintiff must demonstrate that the Defendants' actions or failures to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the Plaintiff was suffering from a serious medical need and subjectively, the prison staff were aware of the need for medical attention but failed to provide it or ensure that needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Objectively, the medical condition must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839–40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference

4

'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995) *quoting Farmer* 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted. *See Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000), *citing Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

TMJ

The Plaintiff received physical therapy for TMJ from March 9-23, 2009. Then he was discharged from physical therapy with instructions for exercises he could continue independently. ECF No. 35, Exs. G & H, p. 2-3, 7-8. On May 9, 2009, the Plaintiff was seen by Dr. Ayalew for follow-up for his TMJ. Then the Plaintiff reported he had been doing well with the physical therapy and was experiencing no pain. Dr. Ayalew submitted a consultation request for the Plaintiff to be evaluated by an oro-maxillofacial surgery specialist ("OMFS") at the University of Maryland Medical System ("UMMS"). *Id.*, p. 8A-9.

The consultation request was approved and on May 21, 2009, the Plaintiff was evaluated by Robin Yang, DDS, at UMMS. *Id.* p. 10. Dr. Yang noted that the Plaintiff was not a candidate for TMJ surgery. Dr. Yang prescribed a muscle relaxant, soft diet, continued physical therapy, and ice or hot compresses as tolerated for comfort. The Plaintiff was again evaluated by Dr. Ayalew who reviewed Dr. Yang's recommendations, continued the Plaintiff's prescription for a muscle relaxer, and submitted a consultation request for him to be evaluated by Dr. Grace, a TMJ specialist. *Id.*, p. 9-9A.

The Plaintiff was again evaluated by Dr. Ayalew on June 26, 2009. The Plaintiff did not complain of jaw pain. He advised Dr. Ayalew that he was using ice as needed, and his physical therapy had been completed. His prescription for the muscle relaxer was continued. *Id*, p. 15-16. He reported to Dr. Ayalew on July 15, 2009 that he had gone to UMMS to see the oral surgeon but was told he would be rescheduled. *Id.*, p. 20. He was next seen by Dr. Ayalew on October 22, 2009. He had no complaints of jaw pain and did not have any difficulty chewing or eating. His prescription was continued. *Id.*, p. 31.

On November 5, 2009, the Plaintiff was evaluated by an OMFS at UMMS.[4] The Plaintiff advised that he continued to have pain in his left TMJ, and his condition had not improved over the past eight years. He advised the doctor that he followed Dr. Yang's recommendations which resulted in some relief. The specialist recommended that the Plaintiff follow-up with a dentist for further treatment of his TMJ. The Plaintiff's soft diet, heat and ice, muscle relaxant, and physical therapy were continued. *Id.*, p. 37.

The Plaintiff was next evaluated on December 11, 2009, by Dr. Ayalew. His muscle relaxant was continued, and Dr. Ayalew submitted a consultation request form for him to be seen by a TMJ disorder specialist. *Id.* Ex. G.

On April 5, 2010, the Plaintiff was examined by Alan Graves, DDS. Dr. Graves submitted a consultation request form for the Plaintiff to follow-up with an OMFS for his chronic pain. Dr. Graves noted a CT scan had been requested but had not been taken because of the Plaintiff's transfer to WCI. *Id.*, p. 54.[5]

---

[4] The notes reflect that due to scheduling conflicts the Plaintiff was unable to be seen by Dr. Grace before the doctor retired. *Id.*, p. 37.

[5] In late January/early February, 2010, the Plaintiff was transferred from the Jessup region to the Western Correctional Institution in Cumberland, Maryland. He alleges that this transfer was retaliatory and interfered with his medical care. He has provided notes from Doctors Mickel and Ottey, physicians working at WCI, recommending that he be transferred back to the Jessup region due to their erroneous belief that he was scheduled

The Plaintiff was evaluated by Dr. Joubert on April 19, 2010, in the Chronic Care Clinic ("CCC"). He did not complain about TMJ pain during that visit. Dr. Joubert prescribed Extra Strength Tylenol for the Plaintiff's back pain. *Id.*, p. 55.

The Plaintiff's TMJ has been conservatively managed. He received pain relief from the combination of muscle relaxant, independent physical therapy, ice and heat, and soft diet. He is not a candidate for surgery. He has suffered some delay in having his condition reviewed by outside experts because of the retirement of certain experts in the field and scheduling difficulties. The Plaintiff has provided a copy of a medical note dated June 10, 2011 indicating that a new consuiltation request for the Plaintiff's TMJ has been generated. ECF No. 56, Attachment. On this record, no reasonable fact finder could find that the Defendants have been deliberately indifferent to the Plaintiff's medical needs for his TMJ.

Left Arm Brace

On June 1, 2009, the Plaintiff requested a new sleeve for his arm brace. Dr. Ayalew noted that a new sleeve would be requested from the dispensary. *Id*, p. 14. When the Plaintiff next saw Dr. Ayalew, on July 15, 2009, he reported that he had not received the new sleeve. *Id.* p. 20. The Plaintiff complained about the padding in his arm brace to Zygmunt Bogucki, P.A. on August 27, 2009, noting that the brace was pressing into his soft tissue. Bogucki referred him to Dr. Ayalew for evaluation of his brace. *Id*, p. 24-25. Dr. Ayalew saw the Plaintiff on

---

for multiple surgeries in the Baltimore area. The Plaintiff filed a request for injunctive relief about his transfer in litigation that was pending before this Court at the time of his transfer. *See McCoy v. Clark*, Civil Action No. WDQ-00-900 (D. Md. 2000). In that matter, Dereje Tesfaye. M.D., Statewide Medical Director for Correctional Medical Services, Inc., and Sharon L. Baucom, M.D., Medical Director and Deputy Director of Clinical Services for the Maryland Department of Public Safety and Correctional Services' Office of Inmate Health Services, averred that they had spoken about the Plaintiff's continuing care. Dr. Tesfaye advised Dr. Baucom that the Plaintiff had been dissatisfied with the medical care he received at MCI-J. Dr. Tesfaye believed the Plaintiff's back concerns could be managed better with the on-site specialty provider located at WCI because more on-site physical therapy was available at WCI than at MCI-J and the Plaintiff would have access to a board certified neurologist. Dr. Tesfaye further averred that he believed that the handicap accessible cells at WCI would be more beneficial to the Plaintiff than the handicap accessible cells at MCI-J. *McCoy v. Clark*, Civil Action No. WDQ-00-900 (D. Md. 2000), ECF No. 115, Exs. 3 & 4.

October 14, 2009. The Plaintiff advised Dr. Ayalew that the brace pads were worn out and causing skin irritation. Dr. Ayalew noted that he would refer the Plaintiff to The Brace Shop.[6] *Id.*, p. 29-30.

On January 17, 2010, the Plaintiff was transferred to the Western Correctional Institution. He had not been taken to The Brace Shop before his transfer. On February 28, 2010, he was evaluated by Nurse Trenum for complaints of neck spasm down his left arm. Trenum noted that the Plaintiff was not wearing his brace during the visit. The Plaintiff advised Trenum that he had removed the brace that morning. Trenum noted he was able to move his arm. The Plaintiff described his pain level as 8 out of 10, with ten the most severe. He advised that he had not taken any medication for the pain, and showers helped relieve the pain and spasms. His prescriptions for muscle relaxant and Extra Strength Tylenol were continued. *Id.*, p. 51.

In May 2010, the Plaintiff was transferred to the Roxbury Correctional Institution. On May 12, 2010, he was evaluated by Nurse King who noted that he had a left arm brace, right leg brace, walker and prosthetic shoes to use as needed. *Id.* p. 58.

On June 18, 2010, the Plaintiff was evaluated by Kevin McDonald, P.A. because the Plaintiff's left arm brace had a worn sleeve which had begun to abrade the Plaintiff's left elbow. The P.A. noted that a consultation request for the brace was pending. He referred the Plaintiff to the physician. *Id.*, p. 62-63.

On November 15, 2010, Dr. Temesgen submitted a consultation request form for Maryland Orthotics and Prosthetics, Inc. ("MOPI") to have the Plaintiff's arm brace repaired. The Plaintiff went to MOPI on January 3, 2011 and the necessary repairs were made. *Id.* Ex G

---

[6] Dr. Ayalews's notes from his consultation with Plaintiff on November 13, 2009, indicate that the Plaintiff was to be provided with a right arm brace by Hanger Prosthetics & Orthotics but Hanger terminated its patient care relationship with the Plaintiff, requiring other arrangements to be made. *Id.*, p. 39.

& H, p. 81-82; ECF No. 38, Attachments. The Plaintiff has provided photographs which show bruising of his inner elbow. ECF Nos. 38 & 55, Attachments.

The Court notes that it took over one year for the Plaintiff to be supplied a new arm brace. During that time, the Plaintiff refused the services of the orthopedic specialty shop to which he had been referred and was transferred amongst state prison facilities, adding to the disruption in his care. Although the Court is mindful that the lack of padding in the Plaintiff's arm brace made the brace uncomfortable and caused bruising to the Plaintiff arm, there is no evidence that delay in repair of the brace or receipt of a new brace seriously harmed the Plaintiff or was attributable to the indifference of any of the named Defendants. The Plaintiff's own actions caused, in part, the delay of which he now complains. The Defendants worked to secure repair or replacement of his arm brace.

Knee Pain

On August 27, 2009, the Plaintiff was evaluated by P.A. Bogucki for knee pain. The Plaintiff described the pain as mild, indicating he suffered from the pain for six years. He indicated the pain was worse with walking but improved with rest. Bogucki's examination showed tenderness of the knee with mild pain upon motion. *Id.*, p. 24-25. He was advised to return for follow-up if his condition did not improve within thirty days. *Id.* The Plaintiff was again examined by Bogucki for continued knee pain on September 17, 2009. Bogucki noted that the Plaintiff had mild pain which worsened with walking and improved with rest. Bogucki ordered an x-ray of the Plaintiff's right knee. *Id*, p. 26-27.

Dr. Ayalew examined the Plaintiff on October 22, 2009. He reported the pain was one out of ten. Dr. Ayalew observed that the Plaintiff could walk without difficulty or instability. The Plaintiff advised Dr. Ayalew that he wished to see an orthopedic surgeon. Dr. Ayalew

advised him that as his range of motion was stable and his activities of daily living were not effected by the knee pain, there was no need to refer him to an orthopedic surgeon. Dr. Ayalew also reviewed the Plaintiff's x-rays which showed no acute fracture, dislocation or subluxation. *Id*, p. 28. An x-ray showed two fragments in the region of the tibial tubercle which were described as most likely congenital variants. *Id.* Dr. Ayalew determined that a referral to an orthopedist was not necessary then. *Id.*, p. 31.

The Plaintiff was again seen by Dr. Ayalew on November 13, 2009. The Plaintiff showed Dr. Ayalew an MRI report performed on October 27, 1995. Dr. Ayalew noted that the MRI showed a calcified tubercle from a 1994 fracture and that nothing was done for the Plaintiffs knee when he fractured it in 1994. The Plaintiff again requested to see an orthopedic surgeon at UMMS. Dr. Ayalew referred him to an onsite orthopedic surgeon. *Id.* p. 39-41.

The Plaintiff was evaluated by Lawrence Manning, M.D., on December 1, 2009. Dr. Manning noted that the Plaintiff had marked enlargement of the tibial tubercle and internal derangement of the right knee. Dr. Manning recommended a repeat MRI and a follow-up appointment after the MRI had been taken. Dr. Manning also recommended high topped shoes and orthopedic shoes. *Id.* p. 42.

The Plaintiff returned to Dr. Ayalew in the Chronic Care Clinic on December 11, 2009. Dr. Ayalew noted that the Plaintiff was not then complaining of pain and could bear weight and walk easily. Dr. Ayalew noted Dr. Manning's recommendations and submitted a consultation request form for an MRI to be performed at Bon Secours Hospital. ("BSH"). *Id.*, p. 43-46. 89-92

On February 3, 2010, Dr. Ottey, at WCI, noted that the Plaintiff had advised him that he was to have the MRI before his follow-up visit with Dr. Manning. *Id.*, p. 48. The Plaintiff was seen by Nurse Sparks on February 22, 2010, who noted that the Plaintiff was very demanding

and manipulative and claimed he was "legally owed a transfer to Baltimore where he can be better cared for." *Id.* p. 50.

There are no notes of the Plaintiff's complaint about pain in his knee again until October 10, 2010, when he was again incarcerated at MCI-J.[7] *Id.*, p. 74. At that time he submitted a sick call slip and advised P.A. Bogucki that an MRI had recently been performed. Bogucki noted that he would follow-up with BSH to secure the MRI report. As of the filing of the motion for summary judgment the Defendants report that the Plaintiff had not complained of knee pain. *Id.*, Ex. G. In the Plaintiff's supplement to his opposition to the dispositive motion, he provides additional medical records. He provides a radiology report dated October 11, 2010. On that date an MRI was performed on the Plaintiff's knee. The MRI revealed focal chondoris with a small area of full thickness cartilage loss at the lateral margin of the medial femoral condule; patellar baja with embedded ossicle; and no meniscal or ligament tear. A note from Dr. Yonas Sisay dated June 10, 2011, delineates the Plaintiff's multiple medical problems but makes no reference to his knee. It does indicate that Dr. Sisay was awaiting the report from an orthopedic consultation held on May 15, 2011. The Plaintiff has also provided a physical therapy note dated September 1, 2011. The note states that the Plaintiff provided the physical therapy "notes and MRI dictation [which indicate patient] has been recommended surgery for right knee." ECF No. 56.

The Plaintiff has failed to demonstrate that he has been denied medical care. The medical records and the affidavit of Kasahun Temesgen, M.D. show that the Plaintiff has received medical care. Moreover, the records demonstrate that the Plaintiff received appropriate care regarding his knee pain and is now awaiting surgery. His unsupported allegations of denial of

---

[7] The Plaintiff was seen by P.A. Bogucki on July 12, 2010, and complained of left leg pain below the knee secondary to a fall that had occurred two weeks before the evaluation. *Id.*, p. 66-67.

medical care are little more than a disagreement with the judgment of his health care providers. Such disagreement with his course of treatment is not a basis for relief. *See Russell v. Sheffer*, 528 F. 2d 318 (4th Cir. 1975).

Foot Problems

On March 9, 2009, the Plaintiff complained of right foot pain around a bunion and in his heel. He described the pain as mild, made worse with walking and improved with rest. Bogucki examined him and noted that his foot was tender around the bunion and lateral heel area. *Id*. Ex. G & H, p. 4-5. Bogucki directed him to return for follow-up in 60 days if the condition worsened or failed to improve. On that date, an x-ray of the right heel was taken. It showed no evidence of heel spurs. *Id.*, p. 6. On May 28, 2009, the Plaintiff was again evaluated by Bogucki for complaints about the bunion on his right foot and corn on his left small toe. He indicated that the ailments caused difficulty when he walked and improved with rest. Bogucki noted that the Plaintiff had the bunion since 2004. He referred him to Dr. Ayalew for further evaluation. *Id.*, p. 11-12. The Plaintiff was seen by Dr. Ayalew on June 1, 2009. He reported difficulty walking and putting on shoes from the pain in his foot. Dr. Ayalew noted that the Plaintiff had a hammer toe malformation of his left fifth toe and his right fifth toe had been amputated for the same reason after conservative treatment had failed. The Plaintiff requested high top boots and complained that he had received high top tennis shoes instead. He advised Dr. Ayalew that he had refused the high top tennis shoes and sent them back to the vendor. Dr. Ayalew indicated he would refer the Plaintiff to a podiatrist and request orthotic shoes. *Id.*, p. 13-14. When the Plaintiff next saw Dr. Ayalew on June 26, 2009, the doctor noted that he was scheduled for referral for the footwear. *Id.*, p. 15.

The Plaintiff was evaluated by David B. Samuels, DPM at BSH on July 1, 2009. Dr. Samuels noted a corn on the fifth toe of his left foot, a bunion on the right foot, and right sided foot drop, for which the Plaintiff wore a brace. Dr. Samuels debrided the Plaintiff's left fifth toe. He noted that he spoke with the Plaintiff about possible surgical correction of the fifth toe of the left foot and bunion of the right foot which would require x-ray evaluation. Dr. Samuels also recommended that the Plaintiff receive new orthopedic shoes and high top tennis shoes. He directed the Plaintiff be seen for follow-up in six weeks. *Id.*, p. 17-19.

On July 15, 2009, the Plaintiff advised Dr. Ayalew that his toe had improved significantly since the debridement on July 1, 2009. *Id.*, p. 20. Dr. Ayalew noted that the Plaintiff's orthopedic shoes had been ordered. On July 29, 2009, Dr. Ayalew spoke with the Plaintiff. Dr. Ayalew advised him that Hanger Orthotics had sent a note that the Plaintiff had refused services from them. The Plaintiff admitted he had refused services, advising Dr. Ayalew that he had been sent to Hanger in the past, and did not want to see them; he wanted to go to another facility. *Id.*, p. 21.

On August 7, 2009, Dr. Ayalew submitted another consultation request for the Plaintiff to see a podiatrist for possible surgical correction of his left fifth toe and x-rays to assess same. *Id.*, p. 22. He again saw Dr. Ayalew on August 14 and October 22, 2009. He again refused to see Hanger for his shoes. *Id.*, p. 23 & 31. He was evaluated by a podiatrist at BSH on October 28, 2009. The podiatrist noted he had been using a bunion padded shield on his right foot which the Plaintiff reported had been helpful. The Plaintiff advised that he had no pain; he did report, however, that he favored his left foot when walking and had developed a corn on the dorsal aspect of the fifth toe. The doctor debrided the lesion on his left fifth toe and prescribed orthopedic shoes and high-topped sneakers. The podiatrist noted that he would re-evaluate the

Plaintiff after he received the prescribed shoes to determine if the bunion or hammer toes were still bothering him. *Id.*, p. 33-35.

On November 6, 2009, Hanger sent the Plaintiff a letter advising him that they were terminating him as a patient and would no longer treat him. *Id*, p. 38. Dr. Ayalew notified the Plaintiff, on November 13, 2009, that when CMS found a new vendor that would treat him, he would be referred for shoes. The Plaintiff had no complaints about his foot at that time. *Id.*

He was incarcerated at WCI or RCI from January 22 to July 12, 2010. He was transferred back to MCI-J and, on August 27, 2010, a new consultation request form was submitted for him to follow-up with a podiatrist. *Id.*, p. 71-72. He was evaluated by the podiatrist on November 10, 2010. *Id.*, p. 76. His left fifth toe was again debrided and it was again recommended he receive orthopedic shoes. The doctor recommended that the Plaintiff receive orthopedic shoes from Van Dyke and Bacon, a specialty shoe shop. He went to Van Dyke and Bacon on January 25, 2011, and was measured for the recommended shoes. *Id.* Exs. G & H, p. 76-77, 81, 82. The Plaintiff has provided evidence that at some time since the filing of the motions for summary judgment his orthopedic shoe was sent out for repair and the podiatrist recommended he try Neurontin as part of his treatment for foot pain. ECF No. 56, Attachment.

His receipt of new orthopedic shoes was delayed primarily because he had refused to accept the high top tennis shoes and then refused to be fitted by Hanger. The delay in receipt of the orthopedic shoes caused delays in follow-up with the podiatrist who indicated he would evaluate the Plaintiff further after he had received the orthopedic shoes to determine whether additional treatment would be required. The undisputed evidence is that the Plaintiff's needs were not ignored, and he has suffered no identifiable injury as a result of any delay in providing

the orthopedic shoes or follow-up with the podiatrist. There is no evidence that the delay was caused by a callous disregard for the Plaintiff's medical needs; rather, the Plaintiff was responsible for much of the delay. The Defendants are entitled to summary judgment on this claim.

Back Pain

On June 4, 2010, Dr. Mennon submitted a consultation request for the Plaintiff to see a neurosurgeon for the previously diagnosed lumbar stenosis and cervical radiculopathy. He was scheduled to see the neurosurgeon on June 28, 2010, but refused to go without his medical records. Custody personnel refused to allow him to take his records with him. Dr. Mennon advised the Plaintiff that his records did not need to go with him to the appointment but the Plaintiff refused to go without them.[8] *Id.*, p. 60-61, 64-65. The Plaintiff's refusal to go to the appointment without his medical records is the sole reason for the delay in medical services for Plaintiff's back. The medical staff had written requests that he be permitted to take his medical records with him to outside physician's appointments. Security staff declined to permit the Plaintiff to do so. The medical staff do not make security decisions.

The Plaintiff has provided additional medical records which indicate that on September 15, 2010 he was evaluated at UMMC in the neurosurgery department. It was recommended at that time that the Plaintiff undergo MRIs of his lumbar and cervical spine. On June 10, 2011, it was noted he was awaiting the scheduling of an open MRI of his spine due to the Plaintiff's stated claustrophobia. The MRI was performed on July 20, 2011. As a result of the MRI, minimally, the Plaintiff was referred to physical therapy. It is not evident from the additional

---

[8] On May 10, 2010, Dr. Mennon had recommended, at the Plaintiff's request, that he be permitted to take his medical records to appointments. *Id.*, p. 58. This directive was renewed on July 12, 2010. *Id.*, p. 69.

15

records provided by the Plaintiff what, if any, additional treatments have been recommended regarding the Plaintiff's neck and back pain. ECF No. 56.

Plaintiff's cane

The Plaintiff was housed at RCI from April 30, 2010 to July 7, 2010. The Plaintiff submitted six sick call slips during this time; none alleged that his cane had been confiscated. He was evaluated by medical staff at RCI on three occasions. *Id.*, Ex. H., p. 83- 88. There is no notation in his chart that he complained that his cane had been confiscated. Dr. Mennon's notes of May 19, 2010, indicate that the Plaintiff was permitted to use an adjustable cane and walker as needed. *Id.*, Ex. H., p. 58-59. Nurse Whitehair avers that she has no recollection of taking the Plaintiff's cane and she would not have taken his cane unless instructed to do so by a physician who had found that the cane was no longer required. *Id.*, Ex. I. Documents submitted by the Plaintiff indicate that a metal walking cane was confiscated by Correctional Officer Winter on May 17, 2010, as contraband. ECF No. 29, Attachment. The record reflects that Nurse Whitehair did not confiscate his cane.

Incontinence

On March 4, 2010, the Plaintiff complained of urinary and fecal incontinence. He advised Dr. Mickel that he did not usually experience incontinence, but he experienced it is when he was agitated and had to sit in a cramped position as in a bus for 30-35 minutes. *Id.*, p. 52.

On that day, a Patient Care Conference was held at WCI between the Plaintiff's medical providers and correctional staff to determine whether his incarceration at WCI was medically appropriate. As a result of the meeting it was determined that it was appropriate to continue the Plaintiff's housing at WCI. It was further determined that when the Plaintiff was to be transported for more than 30 minutes he was to be supplied with Depends or a similar brand of

adult diapers and should have a change of pants with him. *McCoy v. Clark*, Civil Action No. WDQ-00-900 (D. Md. 2009). There is no basis for a finding that the Defendants were indifferent to the Plaintiff's medical needs.

Americans with Disabilities Act (ADA)/Rehabilitation Act (RA) Claims

To establish a prima facie case under Title II of the ADA, the Plaintiff must show that: (1) he has a disability; (2) he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities for which he was otherwise qualified; and (3) the exclusion, denial of benefits, or discrimination was because of his disability. *See Constantine v. George Mason Univ.*, 411 F.3d 474, 498 (4th Cir.2005); *Baird v. Rose*, 192 F.3d 462, 467 (4th Cir.1999). States are obligated to make "reasonable modifications" to enable the disabled person to receive the services or participate in programs or activities. 42 U.S.C. § 12131 et seq. A reasonable modification does not require the public entity to employ any and all means to make services available to persons with disabilities. Rather, the public entity is obligated to make those modifications that do not "fundamentally alter the nature of the service or activity of the public entity or impose an undue burden." *Bircoll v. Miami-Dade County*, 480 F.3d 1072, 1082 (11th Cir.2007).

To the extent the Plaintiff claims that a denial of medical treatment violates his rights under the ADA or RA, his claim fails. Although the Fourth Circuit has not addressed this issue in a published opinion, unpublished cases from this circuit and published and unpublished cases from other circuits indicate that a prisoner may not state a claim under the ADA or RA for a lack of medical treatment.[9] The Plaintiff has failed to establish that he is disabled within the meaning

---

[9] *See, e.g. Miller v. Hinton*, 288 Fed. Appx. 901 (4th Cir. 2008) (prison's alleged denial of access to colostomy bags and catheters by inmate, who was a paraplegic confined to a wheelchair who used such supplies for urinary bladder control, did not constitute disability discrimination in violation of ADA absent a showing that inmate was treated in that manner because of his disability); *Burger v. Bloomberg*, 418 F.3d 882, 883 (8th Cir.2005) (medical care

of the ADA or RA. Nor is there any evidence that the Plaintiff was discriminated against because of a disability. Accordingly, his ADA and RA claims fail.

## Conclusion

In granting summary judgment to the Defendants the Court does not imply that the Plaintiff is not entitled to medical treatment for his serious condition. The right to treatment, however, is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 47-48 (4th Cir.1977) (emphasis added). The undisputed evidence is that the Plaintiff's requests have been considered and his needs addressed. There is no evidence that the delays that have occurred have been deliberate; to the contrary, much of the delay has been caused by the Plaintiff or resulted from an effort to meet his other medical needs, e.g. his back injury. None of the delays resulted in cognizable harm to the Plaintiff. To the extent some of the Plaintiff's many complaints have gone unaddressed, "an inadvertent failure to provide adequate medical care does not amount to deliberate indifference." *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). The Plaintiff's numerous grievances with the medical decisions made about the tests and treatments necessary in light of his symptoms are reflective of his frustration, but "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849(4th Cir.1985), *citing Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3rd Cir.1970). There are no exceptional circumstances in this case.

---

provided to inmate for his diabetes could not be basis for RA action); *Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1144 (10th Cir.2005) (inmate's claims under RA and ADA were properly dismissed for failure to state claim as they were based on medical treatment decisions); *Spencer v. Easter*, 109 Fed. Appx. 571, 573 (4th Cir. 2004) (failure to provide timely refills of prescription drugs did not amount to an ADA violation where there was no showing that it was done based on prisoner's disability); *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir.1996) (holding that the ADA is not "violated by a prison's simply failing to attend to the medical needs of its disabled prisoners. No discrimination is alleged; Bryant was not treated worse because he was disabled.").

Accordingly, the Defendants' Motions for Summary Judgment will be granted.

9/9/11
Date

William D. Quarles, Jr.
United States District Judge